[No. 1451.]

J. A. HAUN *v.* THE STATE.

| 13 | 383 |
| 38 | 140 |

1. INDICTMENT—CONSTITUTIONAL LAW.—That an indictment shall conclude with the words: "Against the peace and dignity of the State," is a requirement of the Constitution which can not be disregarded by the courts. Such words are matter of substance as well as form, and must be so construed.

2. SAME—CASE STATED.—The indictment in this case concluded: "Against the peace and dignity of the State, this the third day of November, 1882." *Held*, that exception that the indictment did not conclude as required by law should have been sustained.

3. SAME—CASES DISTINGUISHED AND APPROVED.—This case distinguished from *Thomas* v. *The State*, 8 Texas Ct. App., 344; and *The State* v. *Pratt*, 44 Texas, 93, cited and approved.

4. PRACTICE—EVIDENCE.—In order to authorize secondary evidence of a lost instrument, some evidence, though slight, must be given to show that the instrument once existed; and it must be shown that a *bona fide* and diligent search has been made for it in the place where it should most likely be found, if the nature of the case admits of such proof.

5. SAME—DILIGENCE.—What degree of diligence in the search of the lost instrument must be shown depends upon the peculiar circumstances of the particular case, but as a general rule the party is required to show that he has, in good faith, exhausted in a reasonable degree all the sources of information and means of discovery which the nature of the case would naturally suggest, and which were accessible.

6. SAME.—The question whether or not a proper basis for such proof has been laid is addressed to the discretion of the trial judge, which this court will not revise except in a case of manifest error. See a state of case wherein a reasonable presumption of the loss is held to have been established, but wherein a more diligent search should have been shown.

7. SAME—FORGERY—PROOF OF HANDWRITING—CASE STATED.—It was in proof that the signatures alleged to have been forged were not in the defendant's handwriting, but apparently in the handwriting of a lady. The theory of the defense was that the signatures were written by the daughter of one of the parties whose signature was alleged to have been forged. To meet this theory the State was permitted, over objection, to introduce the father of the lady, who testified that the handwriting was not hers. *Held*, error, (1) because the rule requires the production (unless its absence be accounted for) of the best evidence of the fact obtainable, which in this case would have been the testimony of the lady herself; and (2) because, which was not done in this case, the witness should have first qualified himself as an expert, or by showing that he had seen the person write.

APPEAL from the District Court of Wise. Tried below before the Hon. C. C. Potter.

The indictment in this case charged the defendant with having in his possession a forged instrument, knowing it to be forged, with intent to pass the same as true; and in a second count, with passing a forged instrument, knowing it to be forged. The latter count was held insufficient, and the defendant, proceeding to trial upon the first, was convicted, and awarded a term of two years in the penitentiary as punishment.

C. B. Beard testified, for the State, in substance, that he was an employe in the banking house of Greathouse & Co., Decatur, Texas, and in that capacity cashed the note upon which this prosecution is founded, for the defendant. This was on July 20, or 21, 1882. On the evening before, the defendant asked him if the indorsement of the Rosenburgs on his note for one hundred and fifty dollars for sixty days would enable him to get the money on it. The witness told him that it would, and at the request of the defendant drew up the note for one hundred and fifty-nine dollars, the nine dollars being for interest. On the next morning the defendant returned, stood around until Mr. Greathouse left the premises and then presented the note, signed with the names of J. A. Haun, David Rosenburg, Walter Rosenburg and Frank Rosenburg. The witness paid him one hundred and fifty dollars, and he left. The witness on second thought concluded that all was not right, and followed him to Aurora, whither he had walked, and caught him just as he was boarding the train.

The note was given to R. V. Bell, the district attorney, since the beginning of court, and the witness had not since seen it.

If it was returned to the witness by Bell, the witness did not remember it. Within the last half hour or so, the witness had searched for it in the note case of the bank, and in every other place about the bank where such papers are kept, and could not find it. H. Greathouse, and a young man named Kirkpatrick, also worked in the bank. This testimony preceded the witness's recital of the transactions with the defendant.

H. Greathouse testified that he had seen the note in question. He gave it to R. V. Bell, district attorney, and had not seen it since.

R. V. Bell testified that he gave the note to C. B. Beard after using it in preparing the indictment in this case. He had carefully and correctly copied the note in the indictment.

The indictment was then introduced to show the contents of the note. It is set out as follows:

"$159.                      DECATUR, TEXAS, July 19, 1882.
"Sixty days after date, waiving grace and protest, we or either of us promise to pay to the order of Greathouse & Co. one hundred and fifty-nine dollars, value received, with twelve per cent interest per annum hereon from maturity till paid, with ten per cent for attorney fees if collected by suit. Negotiable and payable at the banking house of Greathouse & Co., Decatur, Texas.

"J. A. HAUN,
"DAVID ROSENBURG,
"WALTER ROSENBURG,
"FRANK ROSENBURG."

David, Walter and Frank Rosenburg were each examined by the State, and testified that they had seen the note in question, and which appeared signed with the name of each. It was not signed by either of the witnesses, nor was it signed with the knowledge or consent of either of them.

None of the witnesses had ever seen the defendant write, but they had seen letters purporting to have been written by the defendant, and, judging by what they thus knew of the defendant's handwriting, they did not believe that the defendant wrote the signatures to the note. It, the handwriting, looked like the handwriting of a woman. The witness David Rosenburg had a daughter twenty-one years old. Witnesses had known the defendant for ten years and were well acquainted with his charac-

Y

ter for honesty, which had always been good. The opinion states all other facts.

The motion for new trial raised the questions involved in the rulings of this court, assailed the charge of the court and denounced the evidence as insufficient to support the verdict.

*Crane & Sparkman,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, J. In this case the indictment concludes as follows: "Against the peace and dignity of the State, this the third day of November, 1882." Exceptions were made to the indictment, and overruled. One of the exceptions urged to the indictment was that it did not conclude as required by law. We think this exception was well taken and should have been sustained.

In the case of *Cox et al.* v. *The State,* 8 Texas Ct. App., 254, this question is elaborately discussed, and all the authorities bearing upon it are reviewed and cited, and the conclusion arrived at that it is a constitutional requirement that the conclusion of an indictment shall be "Against the peace and dignity of the State," and that this is a matter of substance as well as of form, which it is not within the power of the courts to dispense with or disregard.

It is contended by the assistant attorney general that the words "this the third day of November, 1882," with which the indictment concludes, are no part of the indictment, and should be treated as surplusage. In support of this view he cites *Thomas* v. *The State,* 8 Texas Ct. App., 344. In that case the words "a true bill," were indorsed on the margin of the indictment. The words objected to did not form a part of the indictment, as in this case. They did not follow the words "against the peace and dignity of the State," as they do in the indictment before us.

What are we to understand by the conclusion of an indictment? Does it not signify the end of it, the final termination of the allegations of the pleader? We think it can mean nothing else. It is required that the conclusion shall be "Against the peace and dignity of the State." Nothing more shall be alleged or stated after these words. They constitute the end, the final termination of the indictment. If this be not the meaning of the requirement, we confess we are unable to say what it does

mean. If the words with which this indictment concludes are
no part of it, and can be rejected as surplusage, then any other
words or allegations with which the pleader may choose to con-
clude his indictment may be so treated, and if this be the con-
struction which should be placed upon the constitutional require-
ment under discussion, it would render it meaningless, and of
no imaginable efficacy. This view of the question we do not
consider is in conflict with *The State* v. *Pratt,* 44 Texas, 93, in
which it was held that the addition of the word "Texas" after
"State" did not vitiate the indictment, because that word neither
detracted from nor added to the sentence, but meant exactly
the same thing.

Upon the trial of the case, the alleged forged instrument set
out in the indictment was not produced in evidence, but the
State was permitted to introduce secondary evidence of the
same, over the objections of the defendant. As a basis for the
admission of this secondary evidence, it was proved that the
witness Beard had delivered the original instrument to the dis-
trict attorney, to use in preparing the indictment, and that the
district attorney afterwards returned the same to said Beard;
that Beard had looked in the note case of the bank, and in every
other place about the bank where such papers were usually
kept, for the last half hour or so, and was unable to find the
alleged forged paper. Two other persons, Greathouse and Kirk-
patrick, also worked in the bank. It was not proved that either
Greathouse or Kirkpatrick had searched for the paper. Great-
house stated that the last time he had seen it was when it was
delivered to the district attorney. Beard, to whom the district
attorney testified he returned the paper, testified that he had no
recollection of its being returned to him. Upon this evidence
as to the loss of the paper, the court admitted secondary evi-
dence of the same.

In treating upon this subject Mr. Greenleaf says: "If the
instrument is *lost,* the party is required to give some evidence
that such a paper once existed, though slight evidence is suffi-
cient for this purpose, and that a *bona fide* and diligent search
has been unsuccessfully made for it in the place where it was
most likely to be found, if the nature of the case admits such
proof.    *    *    *    *    *    What degree of diligence in the
search is necessary is not easy to define, as each case depends
much on its peculiar circumstances.    *    *    *    But it seems that
in general the party is expected to show that he has in good

faith exhausted, in a reasonable degree, all the sources of information and means of discovery which the nature of the case would naturally suggest, and which were accessible to him." (1 Greenl. Ev., sec. 558.) If the proof establishes a reasonable presumption of the loss of the instrument, it is held to be sufficient to admit secondary evidence of it. (*Cheatham* v. *Riddle*, 8 Texas, 162.) And the question as to whether or not a basis has been made to let in secondary evidence is a question addressed to the discretion of the trial judge, which the court will not revise, except in a case of manifest error. (*Mays* v. *Moore*, 13 Texas, 85.)

In the case at bar, while we are of the opinion that the production in evidence of the original instrument was material and greatly to be desired, and that the proof of its loss is by no means as conclusive as it should have been, still we think a reasonable presumption of its loss was established; and we would not feel authorized to revise the action of the court below in admitting secondary evidence of it, upon this state of proof, and would not for this reason alone reverse the case. We think, however, in view of the importance of the paper itself, in determining the issue in this case, that a more diligent and thorough search should have made for it. It is not shown that the district attorney made any search whatever for it, but relied altogether upon his recollection that he had returned it to Beard, and yet Beard does not remember that the paper was returned to him. Kirkpatrick also worked in the bank, and might have known the whereabouts of the paper, yet he was not interrogated about it.

It was in proof that the signatures of the persons alleged to have been forged were not in the handwriting of the defendant, but were apparently in the handwriting of a woman. It appears to have been the theory of the defense on the trial, that the daughter of one of the parties whose signature is alleged to have been forged was the person who wrote the signatures to the instrument. In order to destroy this theory the State, over the objections of the defendant, was permitted to prove by the father of this lady that the signatures were not in her handwriting. No basis was laid for the introduction of this evidence. The witness did not qualify himself to testify as to the handwriting of his daughter. He did not state that he was acquainted with her handwriting, or that he had ever seen her write. It was a material issue in the case whether or not the

signatures were in the handwriting of the defendant. If they were not in his handwriting, then it devolved upon the State to prove that they were written by some one without lawful authority and with intent to defraud, and that the defendant had knowledge of these facts. If it was necessary to the case of the State to prove that the lady mentioned did not write the names alleged to be forged, such proof should have been adduced in accordance with the rules of evidence.

One of these rules is that the best evidence attainable should be produced. The testimony of the lady herself would certainly be the best that could be adduced to establish the negative sought to be proved by the State. Her absence was not accounted for, and the admission of secondary evidence under these circumstances was, we think, erroneous. Another rule is that a witness cannot testify as to handwriting without first qualifying himself to do so, either as an expert, or that he has seen the person write, and is acquainted with the handwriting. (*Hanley* v. *Gandy*, 28 Texas, 211; *Mapes* v. *Leal*, 27 Texas, 345.) We think both these rules were violated in permiting the witness Rosenburg to testify that in his opinion the signatures alleged to be forged were not in the handwriting of his daughter. It may be that this evidence had no influence whatever upon the minds of the jury, but, under the circumstances of the case, we think it was calculated to injuriously affect the defendant's rights.

Because the indictment is bad, and because the court erred in admitting the testimony of the witness Rosenburg that the signatures in question were not in the handwriting of his daughter, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered February 3, 1883.